### CLARKE and others *v.* THOMAS LOCKHART and others.

A vendor is bound to explain himself clearly as to the extent of his obligations ; and the exhibition of a sample implies a warranty, that the thing sold by it shall, in general, conform thereto. C. C. 2449. Any secret or hidden defects must be declared, or he who conceals them will be bound to indemnify the party imposed on by such concealment. So the vendor will be bound to indemnify the purchaser, though the inferiority of the thing sold result from the acts of his agent, without his knowledge or consent ; and the measure of damages is the difference between the price given, and that which would have been given, had there been no deception. But where both the vendors, and the purchasers, or their agents, whose knowledge is binding on them, know what the probable hidden defects are, the former are not bound to indemnify the latter ; as where cotton brought from certain sections of country, is known not to be of uniform quality throughout the bale, and the notoriety of the fact lowers the price which it commands in the market, the mere fact that the quality was not equal throughout, unaccompanied with any proof of fraud will not render the vendors liable to the purchaser.

APPEAL from the Commercial Court of New Orleans, *Watts*, J.

GARLAND, J. The petitioners allege, that in the month of May, 1841, they purchased, through Holt & Arrowsmith, their agents in New Orleans, of the defendants, 1215 bales of cotton, weighing 544,312 pounds, at the price of nine and a half cents per pound. That the purchase was made by samples drawn from

said bales, whereby the vendors, by implication of law, warranted the quality of the cotton contained in said bales, to be at least equal to that of the samples drawn from them, and that a sound price was paid for said cotton, on the said implied warranty. That the cotton was soon after shipped to Bristol, in England, where it was opened and examined, when it was discovered, "that in 833 of said bales, "the cotton was packed in the manner usually termed *plated*, or falsely packed, that is to say, the cotton in the interior of the bales was of a different and inferior quality, to that on the outside, and to that contained in those parts of the bales from which samples were drawn." That said 833 bales contained 373,972 pounds of cotton, which was worth three farthings per pound less than it would have been worth, if the interior and exterior parts of the bales had corresponded. That the said difference in value, amounts to the sum of £1168, 13s. 3d. sterling ; and that a further sum of £118, 18s. 11d., was expended in having said cotton examined, and in discriminating between the bales falsely packed and those not ; for which sums, amounting to $6232 62, they pray for judgment against the defendants.

The answer of the defendants, states that, as factors, they sold to Holt & Arrowsmith, through the agency of Megget & Bergerot, brokers, on the 25th May, 1841, twelve hundred and fifteen bales of cotton, with the numbers and marks set forth in a statement filed, which also contains the names of the shippers of the cotton to them. They say, that the cotton was grown in North Alabama and Tennessee, which fact was known to the purchasers, and that they (the respondents,) sold it in the same condition in which it was received by them, and that they were not the owners of the cotton, but agents for selling the same. That it is not a fact, that the cotton was sold by samples furnished by them ; but that the quality was ascertained by the brokers, acting as the agents of the purchasers. That if the cotton was falsely packed, they are not responsible therefor, as they were ignorant of it, and acted in the matter as agents of the owners, (whose names are furnished), which fact was known to the purchasers, and that, as such agents, they have accounted for the price to their respective principals. The respondents

Clarke and others v. Lockhart and others.

further deny, that the cotton sold by them was falsely packed, or *plated*. They say, that it is the case with all the cotton grown and packed in Tennessee and North Alabama, that it is not throughout the bales of a like quality and condition, which is caused by the different pickings of the crop being mixed together, and the crops from different plantations being often baled together at a common gin, all of which facts are well known to the factors and purchasers in the New Orleans market, and materially affect the price of cotton from that quarter of the country; and that said facts were known to Holt & Arrowsmith, and the brokers employed by them.

The evidence is, that Holt & Arrowsmith, who were merchants in New Orleans, were authorized by the plaintiffs, who are cotton spinners and manufacturers at Bristol, in England, to purchase for them a quantity of cotton. They employed Megget & Bergerot as brokers, to buy it for them. The first named of this firm call on the defendants to purchase, and was shown, in their office, the samples of the cotton drawn by them, on which the sale was made. After the contract was entered into, the brokers, as agents of the purchasers, went to the warehouse, where the cotton was stored, and every bale of it was turned out, and examined by them, and another sample drawn from each bale, which was compared with the samples shown by the defendants, and found to correspond. If they had not corresponded, the brokers say, that they would, according to the custom of the market, have refused to receive the cotton, and have thrown up the sale, or claimed a deduction from the price. The examination proving satisfactory, the cotton was received and paid for; and it is admitted that the defendants have accounted to the owners of it for the proceeds. In drawing the samples, the brokers say, that they were drawn from whichever side of the bale was uppermost, and that the bagging was not cut at any particular place; but that the whole examination was made in the usual manner. One of the brokers further states that he was told by the purchaser that it was not necessary to classify or divide the cotton into the different qualities, as it was not to be resold, and was bought for the manufacturers, but to put it all as one class; but that, at the request of Lockhart, one of the defen-

dants, who said that the lot consisted of a number of crops, he did classify it; and that it could, with great propriety, be divided into three or four different classes or qualities. The cotton was all purchased at an average price of nine and a half cents; although some was worth much more, and some less. This is proved, by several brokers and purchasers, to be the usual mode of buying cotton in the New Orleans market. It is further shown by the most conclusive evidence, that it is well known to brokers, factors, and purchasers, that the lower qualities of the cotton grown and packed in Tennessee and North Alabama, do not run so regularly through the bales, as the cotton of Mississippi and Louisiana does; that is, that cotton of various qualities and color is often found in the same bale. This fact is proved to have been known to the brokers and purchasers in this instance; and in consequence of the notoriety of this fact, the price of the article is much affected by it, some brokers say to the extent of a cent in the pound. Sometimes the worst part of the cotton is at the place where the sample is taken, and sometimes the best, and the whole bale is judged by the sample. The brokers and purchasers say that the causes of this difference is, that the different pickings of the same crop are put into the same bale; that different crops are mixed, sometimes at a common gin; and that the planters generally are not so particular in separating the different qualities, as those in Mississippi and Louisiana. Meggett says that, as a general rule, he would not advise a purchaser to give the same price for Tennessee and North Alabama cotton, that he would for Louisiana and Mississippi of the same appearance. Holt, one of the purchasers of the cotton, says, that he is acquainted with the Tennessee and North Alabama cottons. That he has a prejudice against them, and that when he buys them, he does not expect them to run regularly through the bale, as he does the cotton of this State and Mississippi. He says, that the staple is not so good; that it does not suit his friends, and will not bring so good a price in Liverpool, because he considers they run some risk with the one, which they do not with the other.

In the latter part of May, 1841, the cotton was shipped to Bristol, consigned to the plaintiffs. When it was landed from

the ships, about the middle of July, it was again sampled by the plaintiffs, and no complaint was made about it. Three hundred and seventy bales were hauled from the wharf to the mills ; and eight hundred and forty-five were stored in the plaintiffs' warehouses. None of the cotton was opened until about the middle of October, between which period and the date of the purchase, it is proved that cotton had fallen considerably in value. When, at the mills, it was opened for the purpose of being used, complaints were made by the agents, or superintendents, and reports of its condition were made to the plaintiffs, or their special managers. A particular examination of it was ordered, and several individuals connected with the mills testify, that there was cotton of different qualities in three hundred and one of those bales ; that the interior did not correspond with the exterior; that the cotton, to some extent, was "dirty, foxey, and clotted," inferior inside of the bales, and on the outside, fair, merchantable cotton ; and that the cotton was falsely packed originally. For the purpose of making an examination of the 845 bales that were in the ware-houses at Bristol, two brokers were sent for to Liverpool, a distance of 220 miles, because, as it is stated, Bristol not being a cotton market, there were no persons there competent to form a correct opinion as to the condition of the cotton, and the difference in value. These brokers examined the cotton in the ware-houses ; but although they had been brought from so great a distance, they never went to the mills at all, and never saw the cotton there. They swear, that every bale was opened in their presence, and examined by them. That the cotton was of a different quality inside the bales from that on the outside ; that different qualities were in the same bale; that some was stained and of an inferior staple ; and that 532 bales were *falsely packed.* A young man in the employ of the plaintiffs, as a keeper of their ware-house, also testifies, that he was with the two brokers during the whole examination, keeping a list of the bales condemned, or approved; that it was obvious that the cotton was falsely or fraudulently packed ; that the inside of the bales contained cotton so little resembling the outside, as to be clear to an ordinary observer. The brokers say, that they examined the cotton under the belief " that the

same was more or less falsely packed," and that the examination was made at the request of the plaintiffs; and being asked what they mean by the term *falsely packed*, they say it is, "when the quality at the fair, or sampling end of a bale, is better than the interior of the same bale." They further say, that "the market value in Liverpool, according to the samples taken from the sampling end, in the ordinary way, on the 25th of May, was 6¼d. per lb., and at the time of the examination, 5½d. per lb.; that in its fraudulent state, it would have been worth ¾d. per lb. less." The outsides of the bales were not all alike, nor were the insides; in many there were various qualities of cotton. They did not separate the bad from the good cotton; and cannot tell what the proportion was. The bales were in good order, and the outside was rather more free from leaf, or cleaner, and of a better color than the interior. None of the witnesses in England know of any difference in the mode of packing cotton in Tennessee and Alabama, and in Louisiana and Mississippi. They all say, that uniformity throughout the bale is expected; and that various qualities of cotton are not expected to be in the same bale; if there be, they consider it fraudulent packing.

The defendants gave in evidence, the depositions of a number of planters and overseers, taken in Alabama, which prove that the lot of cotton sold to the plaintiffs, was made up of a number of crops belonging to persons in four or five different counties in that State. That the season for gathering the crop of 1840 was an unfavorable one, being very wet; and that in consequence of this the quality of the cotton varied very much. All the witnesses state, that it is not the practice in that section of country to separate the different pickings or qualities of cotton; but that the whole is *ginned*, and pressed into bales as it is taken from the mass. They say, that no pains were taken in pressing, to put the good cotton on the outside of the bales, and that of an inferior quality inside; and that it was as probable the bad would be outside and the good inside, as the reverse. There is no evidence of any of the bales being what is called *plated;* nor is it pretended that there was any thing in them but cotton of some kind. The complaint is, that it was of dif-

ferent qualities, "and did not run through the bales regularly," in conformity with the sample.

There was a judgment in favor of the plaintiffs for $4,000; and the defendants have appealed.

It is a well settled principle of law, that a seller is bound to explain himself clearly as to the extent of his obligations; and the exhibition of a sample implies a warranty that the thing sold by it shall, in general, be in conformity to it. The sample is a tacit representation of the quality of the merchandize sold. Civil Code, art. 2449. 1 Mart. N. S. 312. 4 Robinson, 315. A planter who sells his produce to a merchant, is as much bound to act in good faith as the latter is in selling him his merchandize. If there be any secret or hidden defects they must be declared; and, if not, he who conceals them must indemnify the party imposed upon by such concealment. A planter is bound to indemnify the purchaser of his cotton, if his agent (even without his consent or knowledge,) has *plated* it, or placed cotton seed, or trash, or stones, or blocks of wood, or any thing else in the middle of the bale, so as to impose upon the purchaser; and the measure of the damages, is the difference between the price given, and that which would have been given had there been no deception practised.

The counsel on both sides admit the law to be as stated, and they only differ as to the application of the facts of this case to it. Our opinion is, that it cannot, with propriety, be said that there is a concealment of the defects of a thing when both parties know what the probable hidden defects are. We have said that there is no evidence that the cotton was *plated*; nor are we by any means satisfied that there was a simultaneous fraudulent packing of the cotton sold by forty or fifty planters, or their agents, in four or five different counties in Alabama. The counsel for the plaintiff admits the improbability of such a suppositon; and, as fraud is not to be presumed, we cannot assume that there was a fraudulent packing and a concealment of defects. It was a fact well known to Megget & Bergerot, the brokers, to Holt & Arrowsmith, the agents of the plaintiffs, and to the defendants, that it was not usual for the Tennessee and North Alabama cottons to be uniform throughout the bale, and

in all cases to conform to the sample in every respect. They all knew that different qualities of cotton were frequently to be found in the same bale; and the knowledge of this fact, generally known in the market, materially affected the price, and was taken into consideration in fixing it. The witnesses all say, that a risk was incurred in purchasing cotton grown in that part of the country; and that consequently, when cotton of different qualities is found in the same bale they are not disappointed, unless there is a great dissimilarity between the sample and the interior of the bale. To the plaintiffs and their brokers and agents in England this peculiarity in these cottons seems not to have been known; and, of course, when they saw that the cotton " *did not run regularly through the bale*," they, at once, supposed it proceeded from fraudulent packing, and did not attribute it to the cause well known to their New Orleans agents, which knowledge had contributed to a reduction of the price. Some of the witnesses say, so strong is the prejudice against those cottons, that purchasers for the French market very seldom buy them. The knowledge which the agents of the plaintiffs had, of the known and general defects of the cotton purchased, is binding on them; and we do not consider it legal or just, after those agents have used that knowledge to reduce the price of the cotton, that the principals should set up their ignorance as constituting a claim for reducing it further. Independent of these grounds, the case of the plaintiffs is not presented in a manner free from suspicion. They kept this lot of cotton on hand three months after its arrival. When it was opened the price had declined about three farthings a pound, in the Liverpool market. The brokers fixed the rate of loss, or difference in value, precisely at that rate. They appear to us to have entered upon the examination of the cotton, with a predetermined belief or impression that it was falsely packed; and their object seems to us to have been rather to fix a scale for damages, than to ascertain first what was the true state of the case. They did not separate the good cotton from the bad, and could not tell any thing as to the proportions in each bale, or in the whole number of bales. As to the cotton which was passed by the brokers, they do not tell us

of what quality it was, which we consider an important fact. The whole was sold as a "middling list of Alabamas," which was fixed by taking an average of the different qualities composing the lot; and Megget tells us, that it might well have been divided into three or four classes. There was, therefore, some cotton better than middling, and some inferior; and in fixing a scale for damages it was important to ascertain what the quantity of each was. The course pursued by the plaintiffs gave them the benefit of all the cotton that might be above middling, and would throw the loss on all below that quality on the defendants. In truth, if full effect be given to the course of the plaintiffs, and to their evidence, the sellers of cotton would be completely in the power of purchasers in foreign countries. Months after the cotton is in their ware-houses or mills, a charge is made of fraudulent packing. A survey, or examination is made by persons selected by the purchasers themselves, not under oath, and without notice to the party upon whom a claim is intended to be made. When that claim is made by suit, the selected witnesses are examined, a year or more after the survey, and as few particulars as possible given, by which the accuracy of the general result can be tested. When parties have such advantages, they must make out a clear case to entitle them to recover.

The testimony of Mure, shews that the plaintiffs did not pursue the course usual in Liverpool, for the purpose of ascertaining the loss. There, the spinner, or purchaser, when he discovers the fraud or defects in the cotton, either returns the whole bale, or when the quantity is not sufficient to authorize that, he returns the inferior cotton to the seller, and it is sold, and the difference made up by him.

There is a material difference between the facts of this case, and those of *Brown* v. *Duplantier*, 1 Mart., N. S., 312, and *Stiff* v. *Nugent &c.*, 5 Rob., 217, which we have particularly examined.

It is, therefore, ordered and decreed, that the judgment of the Commercial Court be annulled and reversed, and ours is in favor of the defendants as in case of non-suit, with the costs in both courts.

*Benjamin*, for the plaintiff's.

*P. Anderson* and *Grymes*, for the appellants.