LAND, J.
Plaintiff sold to defendant, represented by an agent, three car loads of cotton seed, at a price of $20 per ton. At the time of the sale the seed formed part of a pile of seed in plaintiff’s ginhouse. The cars of seed were shipped to defendant at Shreveport, and after inspection were rejected as damaged and unmerchantable and over 50 per cent, rotten. Whereupon the plaintiff paid the freight and demurrage, sold the seed *329 at the market price, and sued the defendant for $651.25, representing its loss in the transaction.
Defendant answered that it had bought good, sound seed, at the current market price, and that the seed shipped by the plaintiff was damaged and unmerchantable and more than 50 per cent, rotten, and that consequently the defendant was justified in rejecting the seed and refusing to pay for the same.
On the first trial of the case in the district court judgment was rendered in favor of the plaintiff. A new trial was granted, and on the second trial judgment was rendered in favor of the defendant. Plaintiff thereupon appealed to the Court of Appeals, which reversed the judgment below, and rendered judgment in favor of the plaintiff as prayed for in the petition.
The case is before us on a writ of review granted on the application of the defendant.
It is an 'undisputed fact that on inspection at Shreveport about one-half of the seed in the three cars were found to be rotten, and the seed as a whole were mixed with bolls, motes, and dirt. One witness estimated the dirt at 10 per cent.
[1,2] The contention of the plaintiff is that the agent of the defendant was invited to inspect the seed, and if he did not do so it was his own fault, that the defective condition of the seed was ascertainable by simple inspection, and that the plaintiff’s manager did not make any misrepresentation as to the quality of the seed.
The Court of Appeals said, in part, as follows:
“The evidence in our opinion altogether fails to sustain the charge that plaintiff misrepresented the seed to the defendant’s agent, or that he concealed the real and actual condition of the seed from him. The plaintiff did inform the buyer of what he knew about the seed, how they had been treated and cared for, and that they were the last of the season of the crop of 1911. These statements are not shown to have been untrue. The plaintiff urged the defendant and his friend to go and examine the seed and to make a price on them, saying he did not know what they were worth. There was certainly no concealment in this, but on the contrary it evidenced the good faith on the part of the plaintiff, and completely negatives any intimation or a desire or an attempt on the part of the plaintiff to impose on the defendant’s agent. There is a total lack of any evidence going to show that plaintiff was guilty of any deceit, fraud, or ill practice. * * “
“There was no special warranty nor representation of soundness; there was no concealment of hidden defects which were known to the plaintiff. In such a case the buyer cannot impeach or be relieved from his contract.”
The Court of Appeals cited Rocchi v. Schwabacher & Hireh, 33 La. Ann. 1364, where, as expressed in the syllabus, the following doctrine was enunciated:
“In the sale of goods by merchants, who were not the manufacturers thereof, where there has been no deceit practiced, and where the means of knowledge were at hand and equally available for both parties, and the subject of purchase was alike open to their inspection, and the purchaser'did not avail himself of these means and opportunities, he will not be heard to say that, in impeachment of the contract of sale, he was deceived by the vendor’s misrepresentations.”
We do not think that the uncontraMcted, evidence in the case supports the statement of facts made in the opinion of the Court of Appeals.
On the second trial of the case in the district court, A. W. Hicks, the manager of plaintiff’s plantation during the years 1911 and 1912, was called as a witness for the defendant. We make the following excerpts from Mr. Hicks’ testimony:
“Q. When were these seed ginned?
“A. At different times, I think that they ginned off and on until the last of March.
“Q. What was their condition when they were put into the seedhouse?
“A. It had rained all fall and they were in bad condition.
“Q. Do you know the condition of these seed prior to the 6th of August, 1912.
“A. Yes, sir, I made a test of them before I went out of the cotton house.
“Q. About what time?
“A. The time we were trying to sell them.
“Q. About what time?
“A. It must have been July or August, or somewhere along there. '
“Q. What did-you find from your test?
“A. I am not an expert, but I think they run about 60 per cent, bad.”
*331 The witness further stated that he sent a sample of the seed to some parties in Natchitoches, who bid $10 per ton, but the offer was not accepted.
Mr. Penland was the president of the plaintiff company. In the examination of Mr. Hicks, counsel for defendant referred to the president as “Mr. Pennel.” We make further excerpts from Mr. Hicks’ testimony:
“~Q. Did you ever make any examination of these seed in Mr. Pennel’s presence?
“A. Yes, sir.
“Q. Cut the seed in his presence?
“A. Yes, sir.
“Q. Did Mr. Pennel know that any of these seed were rotten?
“A. I told him that I thought the seed run about 75 per cent, bad.”
Mr. Hicks further stated that Mr. Penland tried to sell the seed, but “he was always particular not to guarantee them.”
Mr. Penland was not recalled to contradict the testimony of Mr. Hicks.
Hence it may be accepted as a fact that the seed were gotten to the extent of at least 50 per. cent, to the knowledge of the manager and president of the plaintiff company when they were offered for sale to the defendant company.
Mr. Strube, the agent of the defendant company, was a very poor judge of cotton seed, and on his arrival at plaintiff’s plantation sought an interview with Mr. Penland. Mr. Mclver, a dealer in agricultural implements, but who had been a cotton planter for a number of years, was present at the interview. The gist of Mr. Mclver’» testimony is contained in the following answer:
“A. Well, the manager, Mr. Penland, was not feeling very well, and he was over at the house. Mi-. Strube went over to the house and talked to him, and then he called me over there and asked me what I thought about last year’s cotton seed; he said that the I-Iossier Realty Company had some for sale, but that he did not know anything about seed, and I says, ‘If they were not wet when they were ginned and have not been wet since, they ought to be as sound as they were when they were put in there,’ in other words, if the house did not leak, and Mr. Penland says, ‘The house does not leak, and they 'have not been exposed to the weather.’ We discussed it in that way; he said he did not - know anything about it.”
Mr. Strube, testifying to the conversation had with Mr. Penland before Mr. Mclver was called in, said that Mr. Penland stated that he had cut a lot of the seed open and found them sound, and that he had planted 'out of the same seed, and had gotten a good stand, that the seedhouse was first-class and in good condition, and that the seed were from the last cotton, and would not be in any danger of heáting.
Mr. Penland was not recalled to rebut the testimony of either Mclver or of Strube.
Mr. Penland’s version of the transaction is, in substance, as follows:
That Strube came and talked to him, and he advised Strube to go and look at the seed and make' him a price; that Strube asked what the seed were worth, and he replied that he had no price on them, and did not know what they were worth; that he wanted Strube to go and look at the seed, and did not want to move them until he knew what he could get for them. That Strube said that he was not a very good judge of seed, but a gentleman with him could possibly tell and was more familiar with them than he was, so Penland told them to go to the seedhouse and examine them. That Strube called the gentleman over to the gallery, and they talked about the seed, but Penland did not know very much about the seed and told them to go and look at them, and then Strube made an offer of $20 per ton f. o. b. Lake End, which after some thought Penland accepted, and the contract was signed up.
Strube and Mclver never saw the seed, which were in a closed house, and the action of the former, as a reasonable being, must have been influenced by the statements of Penland, the president of the plaintiff company.
*333 Penland knew that the seed had been tested by the manager of the company, and found more than half rotten. He also knew that the seed had been held over because it was not merchantable as á sound article.
He withheld the fact that the seed offered by him for sale were half rotten from the agent of the buyer, who was no judge of seed, and who could not have inspected them in the usual manner.
The representations of the president were, however, sufficient to induce the agent of the defendant to believe that the seed were sound.
In Millaudon v. Price, 3 La. Ann. 4, the purchaser, after making a partial inspection of 2,400 sacks of salt, was influenced to accept the same on the representation of the vendor that they had not been on storage for' more than five or six months. As a matter of fact, the salt had been in storage for 16 or 17 months, and in consequence had deteriorated in quality. The court released the purchaser from his bargain.
In the case at bar there was error in the transaction on the part of defendants' agent superinduced by the concealment of the truth, and by representations on the part of the president of the plaintiff company.
The seed sold were a part of a mass of seed comprising about four car loads, and could not be identified -until they were segregated and loaded. on the cars. The evidence tends to show that the fourth car load was subsequently sold for more than $20 per ton, and was accepted by the purchaser. Therefore the seed in the mass' could not have been of uniform quality. It is difficult to conceive how, under such conditions, the seed sold to the defendant could on the day of sale, have been identified for the purpose of inspection. As held in Millaudon v. Price, 3 La. Ann. 4, the exception to the rule of implied warranty applies “if the article is susceptible of convenient inspection and examination,” and the court cited Duranton, vol. 16, p. 339, to the effect that inspection is not required where the article is covered up by other goods or is in a poorly lighted house.
On this branch of the case we are of opinion that the seed sold could not have been conveniently inspected at the time of the sale, as they were not segregated from other seed in the same house. The sale was of a thing indeterminate in itself. Civil Code, arts. 1915, 1916.
Plaintiffs’ alternative contention that it is entitled to recover the freight and demur-rage paid seems to us to be without merit.
It is therefore ordered that the judgment of the Court of Appeals herein be reversed, and that the judgment of the district court herein be affirmed, and that the plaintiff pay costs in the Court of Appeals and the costs of this proceeding.