(107 So. 299)

No. 25602.

## McNEILL & HIGGINS CO. v. MARTIN.

(Feb. 1, 1926.)

*(Syllabus by Editorial Staff.)*

1. Sales ⊗⇒418(7)—Measure of damage when unfit article delivered is difference between its resale value and cost of replacing with sound article.

Measure of damage for defective performance of contract to deliver article of commerce is the difference between price for which unfit or unsound article had to be sold and cost of replacing it by sound article, and is not the difference between the original cost of the article and the price for which it is sold.

2. Sales ⊗⇒181(12)—"Second sugar" not shown unmerchantable when delivered by discovery of dark sticky substance therein several months later.

Second sugar, shipped in July, and discovered to be full of dark sticky substance on inspection in October, after being stored in barrels during hot months, was not thereby shown to be other than good merchantable second sugar at time of shipment; "second sugar" being the result of putting molasses drained from the first run through the process a second time.

3. Sales ⊗⇒176(4)—Buyer, failing to inspect sugar for over three months, not entitled to damages for defective quality.

Buyer of second sugar, shipped in July, and stored in barrels throughout summer, failing to inspect same until the end of October, is precluded by laches from recovering damages for defective quality.

4. Food ⊗⇒6—Second sugar becoming lumpy held not "unwholesome" within federal Pure Food and Drug Law (Act Cong. June 30, 1906 [U. S. Comp. St. §§ 8717–8728]).

Second sugar, found caked and lumpy because of excess molasses, after having been stored in barrels during summer months, *held* not unwholesome, within meaning of federal Pure Food and Drug Law (U. S. Comp. St. §§ 8717–8728).

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Suit by the McNeill & Higgins Company, a corporation, against James W. Martin. Judgment for defendant, and plaintiff appeals. Affirmed.

John D. Nix, Jr., and Walter W. Wright, both of New Orleans, for appellant.

Carroll & Carroll, of New Orleans, for appellee.

ST. PAUL, J. On July 15, 1920, defendant sold plaintiff "170 barrels (not more) St. Delphine *second* sugars." On July 21st defendant shipped 159 barrels of *St. Delphine*

*second sugars,* which were duly received and paid for by plaintiff on July 27th.

On receipt of the sugar, plaintiff made only a "casual" inspection thereof, and placed same in its warehouse; the reason why only a *casual,* and not a *thorough,* inspection thereof was made, being that plaintiff's "regular" sugar buyer was then taking his summer vacation, who remained away for the whole of the month of August, and discontinued altogether his connection with plaintiff on September 1st.

No *thorough* inspection of the sugar was ever made thereafter, until October 26th; the occasion for such inspection at that time being, that, "about the middle of October," plaintiff sold and shipped part of said sugar to some of its customers, who rejected and returned it as being *then* "unfit for use."

Whereupon plaintiff, claiming that said sugar "contained black specks, sticks, and lumpy matter, and was neither merchantable nor fit for human consumption," brings this suit to recover from defendant the difference between the cost of said sugar (including freight, storage, labor, insurance, and interest), and the price for which it was obliged to sell it.

### I.

[1] At the very outset, and merely to avoid even the appearance of here establishing a precedent for other like cases, we may say that the measure of damages in a case such as this, viz. for *defective* performance of a contract to deliver an article of commerce by delivering an article that is unfit or unsound, is *not* the difference between the original cost of the article and the price for which it is *sold,* but only the difference between the price for which the unfit or unsound article had to be sold and the cost of replacing it by an article that *is* fit and sound, with due allowance for loss of profits on a proper showing. Thus, "where the breach consists in the *failure* of the seller *to deliver* the goods, the measure of damages is ordinarily the difference between the contract price and the market price of the goods at the time and place of delivery. * * *" 35 Cyc. p. 633, note 32, citing, inter alia, Camors v. Madden, 36 La. Ann. 425. But, "as a general rule, the measure of damages [for *defective* performance of a contract] is the difference in value between *what is tendered* as performance, and *what is due* as performance under the contract." 17 Corp. Jur. 853, note 98. (All italics ours.)

But we do not think that in this case plaintiff is entitled to recover anything from defendant.

### II.

[2] *Second* and *third* sugars are what their names indicate.

The saccharine matter in the juice of the sugar cane will not *all* crystallize into *sugar;* that which will not thus crystallize becomes *molasses,* which is "the uncrystallized syrup produced in the manufacture of sugar," from which it is separated either by draining, or by centrifugal force. Vide Century Dictionary, verbo, *molasses;* verbo, *sugar,* 2.

When the molasses is drained or expelled from the *first* run of "raw" sugar, it takes with it in solution some of the sugar. When this is put through the sugar-making process a *second* time, the proportion of molasses to sugar is of course much greater than in the first process; it is therefore more difficult to drain off or expel the molasses from these *second* sugars than from the *first,* and still more so as to *third* sugars, in consequence of which *second* sugars contain a much larger percentage of molasses than first sugars, and *third* sugars a still greater percentage.

It is therefore not difficult to appreciate the correctness of the uncontradicted testimony in this record that *second* sugars, kept in barrels for several months in the summer time, would not at the end of that time hold

true to samples taken at the time the sugar was put into the barrels. And the *main* complaint of plaintiff is that the sugar, when examined *at the end of, October*, after having been shipped in July, and stored in barrels during August, September, and October, was full of some "dark sticky substance," and that it "would not go through the holes in the sieve (through which an effort was made to sift it), but would roll up in large balls, and  * * *  was soft and wet." And manifestly, in that condition, it was not "fit for use" as *sugar*—all of which was to be expected under the circumstances, and is readily understood from what we have said above.

But the testimony of the owners of the St. Delphine plantation, on which the sugar was made and from whom it was bought by defendant, establishes that, at the time it was shipped, it was merchantable, wholesome, good *second* sugar, and fully up to the samples furnished plaintiff at the time the sugar was sold, and hard black lumps and "black specks that looked like pieces of rusted iron, which would crumble in your fingers like iron rust," are no more than should be expected in sugar that has "caked" because of the molasses in it. For the rest, wood splinters and chips will occasionally get into barrels of sugar (or of anything else) whilst the coopers are heading them up; but the trial judge did not believe, nor do we, that the sugar was full of "sticks."

### III.

We think the sugar was a good, wholesome, merchantable article at the time it was shipped, and came up to the samples furnished plaintiff; that it *then* fulfilled all the requirements of the contract. And, if *afterwards* it was found that "it could not be used for the purposes for which McNeill & Higgins Company had purchased same," the fault does not lie with defendant, who delivered exactly what he contracted to deliver.

### IV.

[3] Moreover, even if the sugar had been, when shipped, in the condition in which it was found to be when inspected by plaintiff, nevertheless plaintiff still could not recover, for—

"The buyer must use reasonable diligence to ascertain the facts. * * * An inspection, trial, or test, to determine whether the goods are of the quality specified, must be made within a reasonable time, and the buyer is guilty of laches precluding rescission [or *damages*, Rocchi v. Schwabacher, 33 La. Ann. 1364], if he delays making such inspection or test for an unreasonable time." 35 Cyc. 153.

And accordingly—

"In the sale of goods by merchants, who were not the manufacturers thereof, where there has been no deceit practiced, and where the means of knowledge were at hand and equally available to both parties, and the subject of purchase was alike open to their inspection, if the purchaser did not avail himself of these means and opportunities, he will not be heard to say, in impeachment of the contract of sale [or in *claiming damages*], that he was deceived by the vendor's misrepresentations." Rocchi v. Schwabacher, 33 La. Ann. 1364.

A fortiori, no such claim can be entertained under such circumstances, when it is not even claimed that the defendant misrepresented the article in any way whatever. And here it is not pretended that there was any representation other than that the sugar was "St. Delphine *second* sugar," and also that "the goods will conform to the Food and Drug Act of Congress of June 30, 1906, and all amendments thereto."

### V.

[4] But the federal Pure Food and Drug Law (Act of June 30, 1906, 34 Stat. at L. 768, c. 3915 [U. S. Comp. St. §§ 8717–8728]) has no application here. The object of that act is to keep unwholesome, adulterated, and misbranded articles out of interstate commerce. Hipolite Egg Co. v. U. S., 31 S. Ct. 364, 220 U. S. 45, 55 L. Ed. 364. Here there can arise no question of *misbranding*, since the article shipped was the identical article

sold (Ninety-Five Barrels, More or Less, Apple Cider Vinegar v. U. S. [C. C. A.] 289 F. 181); and the evidence shows conclusively that the sugar had not been *adulterated* in any way whatsoever. So that the most that could be claimed, under the overwhelming evidence in this case, is that at some time, whether before or after shipment, the sugar had so far *deteriorated* as to be no longer fit for human consumption in its then condition. But it is a far cry from what may not be thought fit for human consumption because it may be *unpalatable*, to that which is unfit for human consumption because it is *unwholesome*. Bird nests, shark fins, blubber, snails, etc., may be highly repulsive as articles of food to many, or even to most persons, but many regard them as delicacies, and none consider them *unwholesome*, because the fact remains that those who have the stomach to consume them, seem to thrive upon them. But indubitably pure food statutes are intended only to secure the people against *unwholesome* foods, and not to regulate their tastes or appetites (except in the matter of strong drink); and of course it is simply inconceivable that *sugar*, which has caked and become lumpy because of an excess of *molasses* left in it, can be unwholesome, even if found unpalatable.

Decree.

The judgment appealed from is therefore affirmed.