## BARKLEY & CO., LTD., v. BURGUIERES CO., LTD.

(July 5, 1927. Opinion and Decree.)
(August 1, 1927. Rehearing Refused.)
(October 4, 1927. Writ of Certiorari and Review Granted by Supreme Court.)

(*Syllabus by the Court*)

1. **Louisiana Digest—Sales—Par. 220, 240.**
Article Civil Code 2521 relative to apparent defects has no application to sales made on samples, when the purchaser has not inspected the thing sold.

2. **Louisiana Digest—Sales—Par. 218, 219, 240.**
Nor does Article 2521 of the Civil Code apply when the thing sold is contained in boxes, bags, barrels or packages which must be opened to permit inspection.

3. **Louisiana Digest—Sales—Par. 220.**
The sample is tacit representation and warranty of the quality of the thing sold, and the vendor must deliver the thing sold equal to the sample.

4. **Louisiana Digest—Sales—Par. 138.**
A buyer who has sold the thing bought may still claim a diminution of the price.

Appeal from Civil District Court. Div. "D". Hon. Porter Parker, Judge.

Action by John Barkley & Co., Ltd., against J. M. Burguieres Co., Ltd.

There was judgment for defendant and plaintiff appealed.

Judgment reversed.

C. R. Beattie and Ivy G. Kittredge, of New Orleans, attorneys for plaintiff, appellant.

Borah, Himel, Block and Borah, of New Orleans, attorneys for defendant, appellee.

## OPINION

CLAIBORNE, J. This is a suit by a purchaser of sugar against his vendor to recover on his warranty.

The plaintiffs, domiciled in the City of New Orleans, allege that on July 22nd, 1921, the defendants, who were members of the Louisiana Sugar and Rice Exchange of New Orleans, exhibited on said Exchange to the plaintiffs, who are also members of said Exchange, a sample of sugar then being made or about to be made by the defendants in their sugar factory in the parish of St. Mary, and offered to sell to plaintiffs a quantity of sugar on the basis of, and to be equal to, said sample; the plaintiff obtained an option on said sugar; that plaintiffs are dealers in sugar and buy it for resale at a profit as was well known to defendants; that prior to completing the purchase of said sugar from the defendants, plaintiffs, by wire and letter, offered the same to Armour and Co.

of Chicago at the price of three and a half cents per pound net F. O. B. plantation; which Armour and Co. accepted and agreed to take two car loads of said sugar; that subsequently plaintiffs accepted the offer of defendants and purchased from them two car loads of said sugar at the price of three and one-quarter cents per pound F. O. B. cars at the factory of the defendants; that on July 28th, 1921, plaintiffs gave defendants shipping instructions directing them to ship said sugar in the name of petitioners, "order notify Armour and Co., Mincemeat Department, Chicago, Ill.," and asking that the shipment be made in two cars containing each 140 barrels as the minimum weight of car load shipments to Chicago was 60,000 pounds; that said sugar was shipped and consigned by defendants, as directed, on two cars; that said sale having been made on the Louisiana Sugar and Rice Exchange was governed by the rules of said Exchange which justify rejection of sugar if not equal to sample; that the sale was of two car loads of sugar, but the exact number of barrels and pounds was not then known until said sugar was made and weighed; that both of said cars moved from the factory of defendants on or about July 31st, 1921; one of said cars was delivered to Armour and Co. in Chicago on August 6th and the other on August 8th, 1921; that on the arrival of said cars at Chicago, Armour and Co. notified plaintiffs of the bad condition of the sugar which was leaking from the barrels like syrup and that they could not accept the same; and that there was a shortage in weight; that in order to save freight and other charges plaintiffs accepted from Armour and Co. an offer of two and one-half cents per pound at shipping point for actual weight; that plaintiff notified the defendants of the complaints of Armour and Co. and offered that each should send an agent to Chicago to ex-

amine the sugar and report, or should agree upon an agent already in Chicago for the same purpose, or have the cars returned to New Orleans where the sugar could be examined, all of which propositions defendants refused to accept; that Armour and Co., having paid plaintiffs for said sugar at three and one-half cents per pound and on factory weights before having received the same or having discovered its bad condition, claimed of plaintiffs the difference in quality and weights and the reduced price of two and one-half cents per pound; that the sugar contained in one car was billed to Armour and Co. and paid by them at 57,321 pounds at three and one-half cents per pound, making $2004.24, while the true weight in said car was 56,050 pounds at two and one-half cents was $1401.25, making a difference of $604.99; that the sugar in the other car was originally billed to Armour and Co. at 59,436 pounds at three and one-half cents was $2080.26, when as a matter of fact the true weight was 57,890 pounds, which at two and one-half cents per pound amounted to $1447.25, making a difference of $633.01, and together $1238.00; that plaintiff reimbursed Armour and Co. the above sum of $1238.00; that the sugar loaded by the defendants upon the cars was not equal to the sample exhibited to plaintiff and on the basis of which it was sold, but was inferior to the sugar of said sample; that the price which Armour and Co. agreed to pay was the price sugar of that quality was then worth, and that it was only because of the quality inferior to the sample that Armour and Co. refused to pay for it; and that the quality and grade of the sugar actually delivered to plaintiffs and to Armour and Co. was not worth more than two and one-half cents per pound; that before the arrival of the sugar in Chicago and before plaintiffs were made aware of the inferior quality of the sugar and short-

age in weight, they had paid the defendants on August 19th, 1921, the price agreed upon, based upon the erroneous factory weights, namely, the sum of $3794.60. The plaintiffs, therefore, claim of the defendants $1238.00 with five per cent per annum interest from August 19th, 1921.

The defendants filed an exception of no cause of action.

This exception is based upon Article 2521 (2497) of the Civil Code, which reads as follows:

"Apparent defects, that is, such as the buyer might have discovered by simple inspection, are among the number of redhibitory vices." C. C. 1847 (1841) S. 3.

This principle has been adopted by the common law. 35 Cyc. 229; 13 Wall 379; 77 U. S. 388.

But this article does not apply in this case for two reasons. The first is that the sugar was sold by sample. In such a case the purchaser does not inspect, and is not expected to inspect, the article sold and delivered. He inspects only the sample. If the article delivered corresponds to the sample, he cannot complain. But it is the obligation of the seller to deliver an article corresponding with the sample. If he does not, the purchaser is under no obligation to consummate the sale by paying the price.

The exhibition of a sample on the sale of merchandise is a tacit representation of its quality, and unless the warranty be clearly and explicitly excepted the vendor must deliver the article in a condition equal to that of the sample.

Brown et al vs. Duplantier, 1 Mart. N. S. 312.

Phillipi vs. Grove, 4 Rob. 315.

Clarke vs. Thomas, 10 Rob. 5.

Hall, Kemp & Co. vs. Plassan, 19 La. Ann. 11.

Penn vs. Kearny, Blois & Co., 21 La. Ann. 237.

Blanc vs. Murray, 36 La. Ann. 169.

Counsel for the defendants, with the utmost confidence, asserts that Article 2531 applies to sales by samples. But he does not rest his assertion upon any authority, nor have we been able to find any. But the Supreme Court of the United States has said in Barward vs. Kellogg, 77 U. S. 388:

"No principle of the Common Law has been better established, or more often affirmed, both in this country, and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim, caveat emptor applies."

"One of the main reasons why the rule does not apply to the case of a sale by sample is because there is no opportunity for personal examination of the bulk of the commodity which the sample is shown to represent."

In Pope vs. Allis, 115 U. S. 371, the court said; "When the subject matter of a sale is not in existence, or not ascertained at the time of the contract, an undertaking that it shall, when existing or ascertained, possess certain qualities, is not a mere warranty, but a condition, the performance of which is precedent to any obligation upon the vendee under the contract, because the existence of these qualities being part of the description of the thing sold becomes essential to its identity and the vendee cannot be obliged to receive and pay for a thing different from that for which he contracted.

Authorities: "and so, when a contract for the sale of goods is made by sample, it

amounts to an undertaking on the part of the seller with the buyer that the goods are similar, both in nature and quality, to those exhibited, and if they do not correspond the buyer may refuse to receive them, or if received, he may return them in a reasonable time allowed for examination and thus rescind the contract. Authorities. The authorities cited sustain this proposition, that when a vendor sells goods of a specified quality, but not in existence, or ascertained, and undertakes to ship them to a distant buyer when made or ascertained, and delivers them to the carrier for the purchaser, the latter is not bound to accept them without examination. The mere delivery of the goods by the vendor to the carrier does not necessarily bind the vendee to accept them. On their arrival he has a right to inspect them to ascertain whether they conform to the contract, and the right to inspect implies the right to reject them if they are not of the quality required by the contract.

"The jury has found that the iron was not of the quality which the contract required, and on that ground, the defendant in error, at the first opportunity, rejected it, as he had a right to do. His suit to recover the price was therefore well brought".

In the above case the plaintiff "brought his suit to recover from the defendants, Thomas J. Pope and James E. Pope, now the plaintiffs in error, the sum of $17,840, the price of the 500 tons of pig iron, which he alleged he bought from them and paid for, but which he refused to accept because it was not of the quality which the defendants had agreed to furnish". See also 5 Elliot on Contracts, p. 1152; Copper vs. Scott, 120 N. W. 630.

Delivery to the purchaser is not synonymous with acceptance by him. McLane vs. His Creditors, 47 La. Ann. 140, 16 So. 764.

A purchaser is entitled to a reasonable delay after delivery before acceptance. McLane vs. His Creditors, 47 La. Ann. 134, 16 So. 764.

To the same effect are the rules of the Sugar Exchange, under which the sale in this case was made.

Rule 2 reads as follows:

"All purchases or sales shall be final, except under the following circumstances: 1st and 2nd; irregularity of any kind not shown in sample."

3rd: "Goods not being equal to sample or description".

The second reason is that Article 2521 does not apply where the articles sold are contained in boxes, bags, barrels or packages, which must be opened to permit inspection and discovery of defects.

Williams vs. Miller, 9 La. 134.

Huntington vs. Lowe, 2 La. Ann. 379.

Richards & Alfred vs. Burke, 7 La. Ann. 242.

Hossier Realty Co. vs. Caddo Cotton Oil Co., 136 La. 328, 67 So. 20.

"Where the plaintiff purchased the potatoes in barrels and shipped them to Shreveport and on opening the barrels there, the potatoes were found to be in a rapidly decaying condition, it was held that the plaintiff could rescind the sale without offering to return them." Richards & Alford vs. Burke, 7 La. Ann. 242.

In this case the sugar as sold was contained in 280 barrels, from which it would have been necessary to remove the heads to make an inspection. This is certainly not the operation mentioned in Article 2521 which provides only for a "simple inspection".

The plaintiffs then filed a supplemental petition. They alleged that the discrepancy

in weights existed at the time the sugar was weighed by defendants and delivered on the plantation for the reason that defendants' scales were out of order; that delivery of said sugar was not made at the plantation, and that the plaintiffs had no opportunity to inspect said sugar until it arrived in Chicago; that either the return of the sugar to Louisiana, or the storing of the same in Chicago instead of selling it to Armour and Co. would have resulted in greater loss because of freight, demurrage, storage and other charges, and because said sugar could not have been sold for a larger price.

The defendants admitted that they were members of the Louisiana Sugar and Rice Exchange, that on July 22nd, 1921, through their broker, James D'Aquin, they offered for sale certain low grade sugars; they admitted that the plaintiffs purchased two carloads of sugar from a sample exhibited at the New Orleans Sugar Exchange by defendants' broker for the price of three and one-quarter cents per pound F. O. B. cars at defendants' factory; that a small portion of the sugars was not manufactured at the time of the sale, but was manufactured shortly thereafter, and that plaintiff could have inspected the sugars before shipment had it so desired; they admit that the sale was made according to the rules of the Sugar Exchange but deny that the rules or the law permit the rejection of sugars after they have been received and paid for; they admit that the sugar was to be weighed and delivered on the plantation, the plantation weights to govern; they admit the shipping instructions; they admit that they refused to send a representative to Chicago to inspect the sugar, because the sugar having been sold and delivered and accepted on the plantation and paid for, the defendants were without further interest in the matter; they aver that if the sugar showed any depreciation in transit it was due to the extreme heat and because the sugars were soft and were sold as such; they admit that the sugars were paid for when delivered at plantation and therefore before they reached Chicago; they denied all the other allegations of the original and supplemental petition.

There was judgment in favor of defendants, dismissing plaintiff's demand.

The reasons for judgment were, in part, that "this sugar was shipped to Chicago in the hot season of the year, and it being a very low grade sugar, the evidence shows that it would necessarily deteriorate. The plaintiff did not see fit to reject the sugar but effected his own settlement with the consignee, and under all these circumstances, I think there should be judgment for the defendant".

The plaintiffs appealed.

As stated above, the sole question in this case is whether the sugar sold to the plaintiffs was delivered by the defendants on the Cypremort plantation in a condition equal to that of the sample on the faith of which the plaintiffs purchased it.

If it was not, it was immaterial whether the inferior quality of the sugar was discovered after delivery or after payment; such is the law of Louisiana.

When the warranty against defects which is of the nature of contracts of sale of movables fails the purchaser has two remedies. If the defects are such as to render the things sold absolutely useless or their use so inconvenient that it must be supposed that the buyer would not have purchased them, the buyer may demand the avoidance or rescission of the sale which our Code denominates as redhibition or the right of return. C. C. 2520 (2496).

If on the other hand the defects are such as to render the things sold useless or merely to diminish their value, or when the qualities which they have been declared to possess are wanting but are not of sufficient importance to induce the buyer to demand a redhibition and then "the buyer may limit his demand to the reduction of the price and retain the things sold at his option." C. C. 2541 (2519).

This is the action "quanti minoris" or in reduction of the price. This action is favored by the courts. 2 La. 471.

Therefore, the plaintiffs lost none of their rights by retaining the sugar.

A buyer who has sold the thing bought may still claim a dimunition of the price.

Brown vs. Duplantier, 1 Mart. N. S. 317.
George vs. Shreveport Cotton Oil Co., 114 La. 503, 38 So. 432.
State vs. Casimere, 43 La. Ann. 446, 9 So. 438.
City of New Orleans vs. Firemen's Charitable Assn., 43 La. Ann. 450, 9 So. 486.
State vs. Ragan, 125 La. 72, 51 So. 89.
Peterkin vs. Martin, 30 La. Ann. 897.

We have seen the sample exhibited by the defendants to the plaintiffs on the Sugar Exchange. It was contained in a glass jar and was almost dry and of the color of light chocolate. We have seen samples of the sugar shipped in barrels by the defendants to Armour and Co. in Chicago, and the samples by the latter sent to the plaintiffs in this case. The samples were contained in almost air-tight tin cans and were wet, soft, sticky, of the consistence of. cuite and dark in color, almost black. Neither in substance, quality, or color, did they resemble the sample exhibited in the Sugar Exchange.

The defendants say that the change was operated by exposure to heat in the hot cars in their trip from the plantation to

Chicago. The barrels were shipped from the plantation on July 31st, 1921, and were delivered in Chicago on August 6th and 8th, 1921, a delay of eight days only.

The exception of no cause of action was based upon the ground that the sugars had been delivered and paid for and hence plaintiff's claim was too late.

This exception is answered and refuted by the case of Pope vs. Allis, 115 U. S. 371, and Louisiana cases quoted above.

Henderson Barkley, president of plaintiff company, testified that Mr. D'Aquin, representative of the defendants on the Sugar Exchange, exhibited to him and another representative of the firm a sample of the Cypremort plantation sugars, which was then partly manufactured, and of which there would be 200 to 250 barrels like the sample; the price agreed on was 3¼ cents at plantation; it was worth 3½ cents in Chicago plus freight; the samples of the sugar sent from Chicago were practically unmerchantable; they sold it to Armour and Co. at 2½ cents, which was a fair price; low grade sugars are usually packed in 300-pound bags; but it was impossible in this case because the sugars would have leaked through the bags; low grade sugars are always made and shipped in hot weather; never had an experience like this before; he was a sugar planter for many years and a sugar broker for the last twelve years; they paid for the sugar before it arrived in Chicago, and Armour and Co. paid for it before they received it, both before they knew of the condition of the sugar; he asked the defendant to have representatives in Chicago examine the sugars or to have the sugars returned here, both of which they declined; he paid Armour and Co. $1238; Mr. Burguieres told him there was something wrong with his scales, he did not have the sugar inspected at the plantation, there was no comparison

between the samples returned to him by Armour and Co. and the original sample on which he purchased; one or two lots compared fairly well; with others there was no comparison; some of them did not show grain and looked like "mass cuite"; none of them were up to sample; they were of lower grade; if he had not sold the sugar it would have continued leaking and they would have had less sugar on hand; he has the samples sent him by Armour and Co. from Chicago; they are closed up and sealed and put in storage; he showed them to several witnesses; he has not seen them since; he received them two years ago, in August, 1921; samples are taken from a portion of the barrels only; soft sugars in barrels will settle and the molasses will go to the bottom; these sugars were a low grade, third, soft sugars; the Burguieres third sugars were of a low grade; he could have sent a man out to the plantation to examine the sugar, but he did not buy it that way; he bought the sugar equal to sample shown him; the defendants did not know to whom he was offering the sugar; he has handled low grade sugars throughout the summer months and they did not deteriorate in summer like these sugars; freshly-made sugars should show no deterioration in moving from New Orleans to Chicago in July and August at a temperature of 94 and 96 in ten days; he handled other low grade sugars in those months and they did not deteriorate; never heard of using refrigerator cars for low grade sugars; at this stage the witness produces the bottle sample upon which he purchased and 20 cans received from Armour and Co. containing samples of the sugars received by them at Chicago; these samples are not up to the first sample in the bottle or jar; masse cuite is sugar and molasses before the molasses is dried out.

E. A. Rainold, a sugar broker for the last thirty years, testified; the plaintiff showed them all the samples; the the sample they bought the sugar on and samples sent them by Armour & Co.; that was in August, 1921; some were of a very inferior grade and others a little better, but none as good as the original sample; and would not be accepted; the sugar of the sample was worth 3¼ cents; that in cans was very inferior and 2½ was a very fair value for it; if the sugars shipped to Chicago in July had been like the original sample they would not have deteriorated like the samples sent from Chicago in August; he has shipped much sugar in the summer months; it is customary to ship sugar of that grade in bags of 320 pounds; the custom is to sample 10% of the barrels unless there is some trouble with the shipment when all should be sampled; he would be surprised to know that anybody had shipped out such sugar as is found in four of these cans; the deterioration of the sample in the bottle would be the same as in the cans; all sugar in the same shipment should show the same deterioration; if some cans show a greater deterioration than others, the sugar must have been shipped that way from the plantation.

Emmet S. Barry, connected with Fenner & Beane, has been in sugar business for twenty-two years testified; in August, 1921, he was shown the sample on which the plaintiff bought sugars from the defendants; he was also shown samples returned from Chicago by Armour & Co.; they were an entirely different character of sugar; one was like masse-cuite and the other was regular ordinary second sugar.

H. Barkley, recalled, testified that the samples exhibited on the trial were the same that he received from Armour; when received they were unpacked in his pres-

ence, and repacked and sealed also in his presence and sent to cold storage with the original sample in a glass jar.

W. M. Mahoney, assistant superintendent of the mincemeat department of Armour & Co., said he saw the sugar received by Armour & Co. from the plaintiffs; he inspected it on August 8, 1921; before the cars were opened and they noticed a black syrup running out of the cars from beneath the doors, and after opening the cars · they found the sugar all over the floor of the car, and a number of the barrels only half or a quarter full; the sugar had an ˙ exceptionally strong molasses flavor which rendered it unfit for mincemeat purposes; he took from each car ten one-and-a-half-pound samples which were packed in one large wooden box on August 16, 1921, and shipped to plaintiffs on August 19 by the American Express Co.; the sugar was weighed under his supervision by one of their checkers, and was also weighed by the official weighmaster of the Chicago Board of Trade; which gave practically the same weight; he sampled the sugar about five inches down in the barrel.

F. M. Walters, buyer of supplies for Armour & Co., gives the same testimony relative to the quality of the sugar; the plaintiffs then wired asking them as a personal favor to advise them the best price at which they could possibly use the sugar on the basis of receiving weights; he took the matter up with their general superintendent and others, and they finally decided they could use the sugar for mincemeat purposes by mixing it with some Java white sugar, a much higher priced and higher grade of sugar, so as to tone down the strong flavor. They consequently offered two and a half cents a pound shipping point for the sugar on actual receiving weights

* * * John Barkley & Co. accepted their offer"; the price was fair considering the quality of the sugar; the sugar was not bought by them on sample; John Barkley followed their "own custom in shipping cars to their own order", notify; the drafts were paid before the cars were opened.

C. E. Holtsberg, assistant auditor of Armour & Co., said that the cars were delivered to Armour & Co. on August 7 and 9 and set for unloading on the 8th and 9th; the drafts were paid August 6, 1921; after deducting the loss of weight and charges the claim of Armour & Co. against the plaintiffs was $1238.00, which they paid.

John Ebben, deputy weighmaster for the Chicago Board of Trade, weighed the sugar; a good many of the barrels were leaking, and a majority of them were short weight; as the sugar was unloaded by the Armour & Co. employees the barrels would be placed on the scales and weighed.

On behalf of the defendant the following witnesses testified:

James D'Aquin, sugar broker of the defendants, who sold the· sugar to plaintiffs. He sold the sugars on the sample furnished by the defendants; if the sugar is low grade like this sugar, there is always a little molasses running towards the part of the barrel that is down on the floor; he would not ship sugars of the sample he sold for mincemeat purposes unless he first sent the buyer a sample; there is some difference between these Chicago samples and the one on which he sold, but these samples may have been taken from the foot of a barrel; the proper way to sample is to run a gimlet at both ends, from every barrel; he has seen some Cypremort sugar

running in the barrels two or three inches; the understanding was that the sugar should be like the sample; there may be a certain amount of deterioration in ten days in hot weather, in some of the barrels; Burguiere sugars are recognized as a good low-grade sugar with a fair flavor.

Ernest A. Burguieres, treasurer of defendant corporation, testified that his office is in New Orleans and that he attends to all the city business; samples of these low-grade sugars were placed by him in the Exchange on the table of his broker D'Aquin; Mr. Barkley came over to the table and made a pyramid of the sugar with his hand and offered 3¼ cents for the sugar F.O.B. plantation; he accepted the offer, to be paid for five days from the date of the bill of lading; he sent the shipping instructions to his brother Denis on the plantation; his brother said to him over the phone: "These sugars cannot be used for mincemeat". His answer that he could not inquire of the buyer what he was going to do with the sugar and to ship it according to instructions to Armour & Co. mincemeat department; the sugar was shipped and paid for within five days; about five or six days after they were paid for, Barkley stated to him that he was having trouble with his buyer in Chicago; he told the plaintiffs that if there was any difference in his scales he was willing to have his scales checked; he expected the sugar to leak and would have been very much astonished if it had not leaked; it is customary to ship sugar in the hot summer month to Chicago and even more distant points; he would not take the risk of selling sugar to send away; he sells it F.O.B. plantation; the buyer takes the risk thence; they have sold sugar on the same conditions as these samples; they have never had any returned to them; this is

the first complaint; the sugar that he sent to Chicago was the last of the season; their low-grade sugars are mincemeat sugars; they never made any suggestion to adjust the matter; they refused all suggestions made by plaintiffs; the plaintiffs suggested to him to send a representative to Chicago, or to appoint someone there, or to bring the sugars down to New Orleans, all of which he declined; it was not fair to keep the sale sample in a bottle and to put the Armour samples in a can; some of the later samples may be taken off from the floor of the car, and do not represent the sugar he sold, nor the sugar in the car; none of the samples in the cans in their present condition equal the sample in the bottle; they are all in different degrees of inferiority; but they would have been a delivery by those accustomed to buy their low-grade sugars; these samples in these cans from Chicago compared with the sample put in the bottle, are not the same; when plaintiffs showed him these samples he did not feel he had anything to do with them.

Oscar Garic, general clerk for the defendant at Louisa since 1905, said he weighed the sugar on the plantation; the scales were correct; he took samples from about 150 barrels; some sugar was manufactured afterwards, about 130 barrels; he sent the sample that he took to New Orleans; the 130 barrels that were made afterwards were the same; the scales have been in use one year; he took the samples five inches from the top; he knows nothing about the quality in sugar; it was a dark sugar.

Denis Burguieres is president of the defendant company and operates the factory; all the sugars were of the same grade; it was the final run of the season; the masse-cuite is put in centrifugals and turned around until all the molasses is

out; when all the molasses is out the sugar is dumped into sacks or barrels; he is the sugar boiler himself; there was no difference in the sugar in any of the barrels; there is no advantage in running centrifugals after a run for a certain time; further running would be useless; the scales were in perfect condition; when he got shipping instructions, he told his brother the sugar would not do for mincemeat; it was not good for human consumption; no low-grade sugar could hold up from the plantation to Chicago; it would leak and run; the factory runs night and day; when a barrel stands up the moisture on the sugar is precipitated to the bottom a few inches.

A striking feature in the testimony is that Denis Burguieres of Cypremort Plantation did not see the sample of the sugar upon which the plaintiffs bought; the samples had been made by Oscar Garic; nor did Ernest Burguieres of the city of New Orleans see the sugar that was shipped from Cypremort. The result was that neither one nor the other was in a position to say that the sugar shipped by the defendants was the same quality as that in the sample, on the faith of which the plaintiffs purchased.

The disinterested evidence is overwhelming, and the defendants themselves testify that the samples sent to Chicago in cans and exhibited on the trial of this case were inferior in quality to the sample in the bottle exhibited at the Exchange by which the plaintiffs bought. But even if the testimony could leave any doubt, the samples themselves speak louder than words. "Dum silent, clamant."

Two reasons are given by the defendant for this difference. One is that time and the weather have affected the sugar in the cans.

If that be true, then the sugar in the bottle should have been affected likewise, and yet it remained the same. Another is that the heat has caused the sugar in the barrels to leak and run at the bottom and to deteriorate. But if the sugar in the barrels had leaked, what remained in them should have been drier and of a better quality, as the heat is said to have done for them what the centrifugal is expected to do, to drive the molasses out. But we do not believe that either time or heat, from the plantation to Chicago, a period of ten or fifteen days, could have produced in the sugar the palpable deterioration and difference which existed in the sugar upon its arrival in Chicago as compared with the sample at the Sugar Exchange. It is in evidence that the latter was of a quality much superior. Sugars of inferior grade, seconds and thirds, are made in summer and sold and shipped in summer without substantial deterioration; if the sugar in this case arrived in Chicago in the condition described by the witnesses and shown by the samples, it is because of its initial inferiority in quality at the time and at the point of shipment. But having received it and paid for it without previous inspection, plaintiffs are entitled to claim and recover a diminution in price corresponding to the diminution in value. In this and other respects plaintiffs have made out a clear case.

The cases of Rocchi vs. Schluzabacher, 33 La. Ann. 1305, and McNeil vs. Martin, 160 La. 443, 107 So. 299, relied on by defendants are not in point. In the Rocchi case the sale was not by sample, and the buyer had, previous to the sale, inspected the barrels of lard through his broker, by all the means known to the trade. In the McNeil case the sale of second sugars was made to him on July 15 and the sugars put in warehouse; McNeil

sold the sugar on October 26, three and a half months later, when it was inspected and discovered to be "unfit for use". The court found that McNeil had not inspected the sugar within a reasonable time and for that reason denied him relief. The court remarked:

"But the testimony of the owners of the St. Delphine Plantation, on which the sugar was made and from whom it was bought by defendant, establishes that at the time it was shipped it was merchantable, wholesome, good, second sugar, and fully up to the samples furnished plaintiff at the time the sugar was sold."

No such testimony exists in this case, and the defects were discovered within ten days of the sale as soon as the barrels were delivered and as soon as an inspection became possible.

It is therefore ordered that the judgment appealed from be reversed and annulled, and it is now ordered that the defendants, the J. M. Burguieres Co., Ltd., be condemned to pay to the plaintiffs herein, John Barkley & Co., Ltd., the sum of one thousand two hundred and thirty-eight dollars with five per cent per annum interest from August 19, 1921, till paid, and all costs.