## No. 7136.

### John Rocchi vs. Schwabacher & Hirsch.

The purchasing broker in this case was the agent of Plaintiff and not that of both parties.

In the sale of goods by merchants, who were not the manufacturers thereof, where there has been no deceit practiced, and where the means of knowledge were at hand and equally available to both parties, and the subject of purchase was alike open to their inspection, if the purchaser did not avail himself of these means and opportunities, he will not be heard to say, in impeachment of the contract of sale, that he was deceived by the vendor's misrepresentations.

A PPEAL from the Sixth District Court for the parish of Orleans.
Rightor, J

---

J. Ad. Rozier for Plaintiff and Appellant :

First—Plaintiff never had any view of the article sold. Defendants knew that the lard was not merchantable.

Second—Article 2501, R. C. C., does not comprise such defects as are concealed by reason of the thing purchased being in a box, barrel or package. 7 An. 243 ; 5 Rob. 217; 3 An. 445; 10 Rob. 5.

Third—As to provisions, vendor represents them as sound and wholesome. Addison Contracts, vol 2, p. 211, § 616. Warranty of kind and quality, as far as it goes. 6 Taunton, 446; 2 Marsh, 141 S. C.; 9 Metcalf, 83 ; 2 Pick. 214; 3 Rawle, 23; 2 Kent, 489. In the sale of provisions for domestic use, vendor at his peril bound to know that they are sound. John R. (N. Y.) 11 Pick. 484.

Fourth—The vendor who knows the vice of a thing, bound to declare it. 18 Illinois, 23. Warranty that the article is reasonably fit for the use for which it was purchased by plaintiff. 1 Mark, 504.

Fifth—By Art. 2445, R. C. C., defendants are answerable to the buyer, besides repayment of expenses, also damages. 1 N. S. 312. There was fraud.

W. S. Benedict and Jos. P. Hornor for Defendants and Appellees :

A sale without warranty of quality, where no representations were made, no facts concealed, no fraud existed, and the vendor was not a manufacturer, but dealer in the property so purchased, below the market price, estops the purchaser from any action to annul the sale.

The Common Law and the Civil Law authorities on this subject are quoted in detail in the brief.

In the case of Slaughter's Administrator vs. Gerson, 13 Wall, 379, the Supreme Court of the United States very concisely states the doctrines to govern this case.

---

The opinion of the Court was delivered by

POCHÉ, J. Plaintiff seeks to recover $10,129 68, as damages alleged to have been occasioned to him by the defendants, in the following transaction :

That in January and February, 1875, plaintiff bought from defendants some 539 tierces of lard, at various prices, which lard he shipped for sale, to the city of Hamburg, in Germany, where 512 tierces of said lard were, on inspection, found of so inferior a quality as to be unmerchantable for cooking purposes, and were sold at public auction for much less than the purchase price thereof, the whole resulting in a loss to him of the amount which he herein claims as damages.

Plaintiff alleges, in substance :

1st. That the lard was offered to him through F. Schexnaider, a broker, by the defendants, who represented the lard thus purchased by him at the highest prices asked on the market for refined lard, as sound and of good quality.

2d. That the lard, which had not been examined or inspected by him, proved, on inspection, at Hamburg, to be an almost worthless commodity, mixed with tallow, grease and water.

3d. That the defects of this lard, which were not discoverable without chemical analysis, were well known to the defendants, who fraudulently concealed such defects to plaintiff.

In addition to a general denial, defendants, after admitting to have sold the lard to plaintiff at the prices alleged by him, denied that they had made any representations or assumed any warranty touching the quality of said lard, and that they were aware of the defects alleged to have existed in said lard, which they allege to have sold, not as manufacturers or owners thereof, but as commission merchants for the house of F. Humbert & Co., of Louisville, Kentucky, all of which was well known to plaintiff, who purchased the said lard through the broker, Schexnaider, who was, in said transaction, acting for and representing plaintiff and was not the agent or employee of defendants, and who purchased said goods after a thorough examination and inspection of the same.

Plaintiff has taken this appeal from the judgment of the District Court, rejecting his demand.

As usual, in cases turning mainly on questions of fact, the record in this cause is swollen by an immense amount of testimony, some of which is conflicting, and all of which has been diligently scanned and analyzed, with a view to do justice between the parties.

1st. As the capacity or status of the broker, Schexnaider, is an important factor in the case, and as his testimony has not been taken by either party, we have taken peculiar pains to scrutinize the evidence which bears upon this, which we consider as the pivotal point in the controversy, and the record shows conclusively to our minds that in these purchases he was the duly accredited broker or agent of plaintiff, who is, therefore, bound by the acts of Schexnaider in the premises. Plaintiff, while denying the agency of Schexnaider, both in his pleadings and in his testimony, admits in evidence that the latter's commission was paid by him ; and he states that, having received an order for a large quantity of lard for shipment to Europe, at as tipulated and limited price, he negotiated with several brokers in Western produce, whose prices did not suit him, and that Schexnaider's prices being lower than all the others, he concluded to deal with him, and that Schexnaider filled the whole order, shipping by one vessel alone some 1304 tierces ; 539 of which were bought from the defendants, and the balance, in sundry lots, from five or six other and different merchants. The evidence further shows that all the bills of such purchases were made by defendants and by the other merchants, in the name of " F. Schexnaider, broker,"

who approved the bills, on whose approval such bills were at once and regularly paid by plaintiff. That, in one case, a dealer who had but a small lot of such lard, was requested by Schexnaider to turn over such lot to defendants, who were instructed by him to include the same in the Rocchi purchase, and to charge the same accordingly. That all the lard purchased from defendants was shipped by Schexnaider, who employed the draymen and other help necessary thereto, whose bills for such services were approved by him, and which bills, when presented, thus approved, were paid by plaintiff.

The uncontradicted testimony of several brokers and other merchants, shows that Schexnaider was at that time, and had been for several years previous, a purchasing broker in Western produce; that he was able and competent to examine, inspect and classify different qualities of such produce, particularly lard, and that he had been employed as such by some of the witnesses themselves and by plaintiff for several years. It also appears that defendants did not offer any lard for sale to plaintiff or his agent, but that the latter called on them, and inquired if they had any lard for sale, and receiving an affirmative answer, he would inspect the goods which were shown him, and purchase the same when the price suited him.

The evidence utterly fails to show that defendants ever made any representations touching the quality of the lard which the agent bought from them, or warranted any lot of such commodity to be of any particular quality or market value.

It appears from the testimony of produce brokers and other experts, that three qualities of lard are generally found and handled on the New Orleans market, the *kettle rendered*, the *steam rendered*, and the *refined*, and that the former is the pure article, and commands the highest prices; that the refined is the next in order, and that the steam rendered is inferior to the two others ; and the evidence shows that the lard purchased from defendants in this case was branded " refined lard."

It also appears that refined lard contains, to the knowledge of all dealers, foreign ingredients besides pure lard, principally tallow, and the grade or quality of refined lard depends upon the quantity or proportion of foreign ingredients which it contains. It is also shown that the presence of tallow as an ingredient in lard is detected mainly by the smell; but also by inspection, which is made by means of an instrument known in the trade as a " *lard tryer*," which is introduced in the tierce through the bung-hole, and is long enough to reach across to the other side of the tierce, and to either end, by which means lard is drawn from various parts of the tierce, and is thus subjected to inspection ; and that this mode of inspection is the only one practiced in the trade.

2d. In this case, it is shown beyond a doubt that all the lard sold

to plaintiff by defendants was examined by the broker, Schexnaider, in the mode above indicated, some of it at defendants' store, other tierces at their warehouse, others at the railroad depot, or at the steamboat landing, while it was being received by defendants on consignment from F. Humbert & Co., the manufacturers, at Louisville, Ky. That this inspection was sometimes made in the presence of one or both of the defendants, or of their clerks or employees, but oftener out of the presence and without the knowledge of either defendants or of any of their clerks. In the latter case, Schexnaider, after examining, at the steamboat landing or elsewhere, any lot of lard which he concluded to purchase, would notify the defendants of the same, on that day or the next.

A careful analysis of the testimony abundantly proves that defendants, who were not the manufacturers of the goods thus sold by them, were perfectly and honestly ignorant of the defects of such goods, of which they had no more occasion, or better means of judging than plaintiff or his broker had ; that the quality of the lard was as well known to the vendee's agent as to the vendors, that the latter made no misrepresentations, and practiced no concealments, fraudulent or otherwise, touching the commodity which they were thus selling. And hence, we conclude that they are not responsible in law for the damages which plaintiff has suffered in this unfortunate speculation, brought about by the error of his own agent, who was not deceived by defendants, but was led astray by his own judgment. The rule which governs such a case is laid down in clear language by the Supreme Court of the United States, in 13 Wallace, 379, as follows :

" The misrepresentations which will vitiate the contract of sale, and prevent a court of equity from aiding its enforcement, must relate to a material matter, constituting an inducement to the contract, and respecting which the complaining party did not possess at hand the means of knowledge ; and it must be a misrepresentation, upon which he relied, and by which he was actually misled to his injury.

" Where the means of knowledge are at hand, and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say, in impeachment of the contract of sale, that he was deceived by the vendor's misrepresentations."

These considerations have also shaped our own jurisprudence on this subject, and have guided our Supreme Court in the conclusions reached in many cases involving similar issues, which cases we have carefully examined, and by which we have been led to the disposition which we make of this controversy. Decuir vs. Packwood, 5 Martin, 306 ; Clark vs. Lockhart, 10 R. 5 ; Huntington vs. Lowe, 3 An. 379 ; Shy-

manski vs. Urquhart, 5 An. 491 ; Holland vs. Toole, 6 An. 426 ; Mure vs. Donnell, 12 An. 369.

The judgment of the lower court is correct, 'and is, therefore, affirmed with costs.

Rehearing refused.