**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION,**
Plaintiff–Appellant,

v.

**TWIN CITY SAVINGS BANK, FSB,**
**and Twin City Savings Bank, FSA,**
Defendants–Appellees.

No. 88–4261.

United States Court of Appeals,
Fifth Circuit.

March 17, 1989.

F. Frank Fontenot, John F. Landrum, New Orleans, La., for plaintiff-appellant.

Lee Wilson, Johnny C. Moore, Baton Rouge, La., for defendants-appellees.

Before RUBIN, GARZA and KING, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The issue presented is whether, under the pre–1985 provisions of the Louisiana Civil Code, a contract may be rescinded for fraud when the party seeking rescission was negligent in not investigating the misrepresentations.

I.

First Federal Savings and Loan contends that Twin City Savings Bank fraudulently deceived it when Twin City sold First Federal a participation in a loan, known as the "Sea Oats" loan. First Federal seeks recision of the contract and return of the purchase price, or, alternatively, damages.

Twin City Savings Bank, which has its main office in Monroe, Louisiana, closed a loan the maximum amount of which was to be $8.6 million to Sea Oats of Juno Beach, Inc., on October 14, 1983. Sea Oats was to call on Twin City for disbursements from time to time to be used for the construction in Palm Beach, Florida, of 232 condominium units, which Sea Oats expected to complete in 18 months, by April 1985. As units were sold the proceeds were to be used to reduce the loan. Sea Oats would then seek further disbursements to finance the construction of additional units. Sea Oats contemplated that units would be sold while the project was being completed, with all units to be sold by September 1985.

The loan was for a term of two years, but Sea Oats had options to extend the maturity date for two additional six-month periods if the loan were not in default. Twin City expected to be only the lead lender in the loan and to sell participations in it to other lenders. In accordance with its plan it sold a $1 million participation to Unifirst Savings Bank of Jackson, Mississippi, retaining the remainder of the loan.

Sea Oats fell behind its construction schedule, requiring it to extend the estimated completion date for the project from April 1985 to August 1986. Two of Sea Oats's officers met with Bill Lewis, the President of Twin City, on November 5, 1985, in Monroe, Louisiana, to advise him of the revised completion date, the new cash-flow projections, and the revised final sale date, which was November 1986, thirteen months later than had originally been contemplated.

Originally, Sea Oats had expected to sell units at an average rate of $12\frac{1}{2}$ per month. A competitive project had, however, been completed, offering cheaper units nearer to town. As a result, by this time, Sea Oats had sold only 4 units per month, a total of 49, and none of the sales had been closed. Therefore, Sea Oats had been unable to reduce the principal amount of the loan as originally planned. The balance due was $8.6 million, more than twice the amount that had been projected to be due in November. Although Sea Oats requested an additional advance of $1 million, neither Twin City nor Sea Oats wished to advance additional funds.

Twin City stopped further funding of the loan, and commissioned Linda Thomason, the president of the Thomason Corporation, a mortgage broker in Tampa, Florida, to sell participations in the Sea Oats loan and in a number of other loans. As a result of Thomason's efforts, Wayne Courtney, the president of First Federal, which has its home office in Mayfield, Kentucky, communicated with her to express his interest in buying participations in construction loans maturing within one year from the date of purchase. Thomason arranged for Courtney to meet with Lewis and her in Monroe, Louisiana, on November 14, 1985.

At this meeting, which was nine days after Lewis' meeting with Sea Oats's officials, the parties discussed a number of loans including Sea Oats's. Courtney was given access to the entire extensive file on that loan and permitted to review all the relevant documents. The district court did

not resolve a dispute concerning whether Courtney actually reviewed the Sea Oats file, but stated that Courtney's itinerary indicated that he would have had very little time to look through the files, apparently referring not only to the Sea Oats file but also to the files on other loans that were discussed.

Following the meeting, Thomason sent Courtney a synopsis of information on the Sea Oats loan, indicating that the loan would mature in one year. Thomason had prepared an information package called "the Blue Book" on each of the loans being offered. Six days later she mailed him the Blue Book on Sea Oats, which contained a summary sheet stating that the loan would mature in one year. The Blue Book also contained a copy of the original Twin City commitment letter to Sea Oats, dated September 12, 1983, stating that the term of the loan would be 24 months from closing, which would have been less than one year from the time when Twin City was negotiating with First Federal. In addition, it contained a copy of Sea Oats's promissory note with a maturity date of November 1, 1985, and a copy of the mortgage and security agreement, stating the same maturity date. While the building loan agreement, which was also contained in the Blue Book, referred to an option to extend the loan, the option itself was not contained in the Blue Book, nor was a later amendment to the commitment letter containing Twin City's agreement to the option.

The Blue Book contained copies of Sea Oats's original business plan, appraisals, and cash-flow projections, but it did not contain Sea Oats's November 4, 1984, revisions that had been delivered to Lewis of Twin City only fifteen days earlier. The Blue Book did contain a year-old market analysis, which did not mention the competing project. It contained no indication that the amount of the loan had been fully drawn by October 1984 or that Twin City had ceased funding the project.

After Courtney had presented the Blue Book to First Federal's Executive Commit-

tee on November 26, 1984, it approved purchase of a participation in the Sea Oats loan subject to a site inspection by Courtney. Two days later Courtney visited the Florida site and inspected the project for approximately one hour. Courtney was given access to the site, the surrounding area, and any documents relating to the loan. Although Sea Oats had completed only 9 of the 29 buildings planned, Courtney made a favorable report to the Executive Committee and signed an agreement to purchase a participation in the loan amounting to $1.9 million. When Twin City received this, it advanced $1 million to Sea Oats, retaining the remaining $900,000.

On December 12, Lewis wrote Courtney that, upon review of the participation certificate, he found that it did not reflect an increase in the loan amount resulting from the number of units under construction from 40 to 72, and that the loan now had a ceiling of $9.6.

Unifirst, the first bank that had bought a participation in the Sea Oats loan, became dissatisfied with Twin City's administration of the loan and, at its request, Twin City designated Unifirst lead lender. When Sea Oats was unable to repay the loan on November 8, 1985, Unifirst extended it for an additional year. At the time of trial in 1987, construction of the Sea Oats project was not complete, and the loan was still unpaid. Sea Oats's president testified that, if the project is finally completed and all units are sold, the proceeds will be $3 million less than the balance due on the loans.

While Twin City was lead lender, it sent First Federal all payments of interest it received, in accordance with the participation agreement. First Federal accepted a payment on December 3, 1985, paying interest through October 31, and it accepted principal-reduction payments from Unifirst on July 18, 1985, and August 15, 1985.

The district court found that Twin City had made material misrepresentations of fact to First Federal in the sale of the participation agreement.[1]

1. *First Fed. Sav. and Loan Ass'n v. Twin City Sav. Bank,* No. 86–1152 (W.D.La. Feb. 12, 1988)

(memorandum ruling).

Specifically, Lewis recommended the Sea Oats loan to Courtney, when Courtney had specified a preference for a loan with a one-year term. Lewis was fully aware of the Option to Extend Loan as well as the financial difficulty that the Sea Oats project had encountered. Further, the Blue Book sent to Courtney containing copies of all of the informational documents of the Sea Oats project contained none of the revised sell-out or build-out dates or the cash flow projections. Lewis was well aware of these facts and did nothing to notify Courtney.

Based on these findings, the Court continued, "Lewis' concealment of such facts constitutes a fraudulent misrepresentation of material facts."

The court stated, however, that "[t]his fraudulent concealment . . . does not constitute such fraud so as to render the agreement void *ab initio*, especially since Courtney had specified that he would also consider loans with a term of greater than one year." The court considered that the fraudulent actions did not, moreover, permit First Federal to rescind the sale because "[t]he law is clear that where both parties have the ability to inspect the subject of the purchase, if the purchaser does not avail himself of this ability, 'he will not be heard to say he was deceived by the vendors misrepresentations.'"[2] The court continued: "This Court will not accept the approach asserted by First Federal in which it would in effect be permitted to keep its blinders on. Courtney had all means available to him to inspect the project as well as the Sea Oats documents. He was careless in not doing so." Therefore, the court concluded that the negligence of the bank's president, Courtney, which is of course imputed to First Federal, barred its claim.

In reaching this conclusion, the district court relied on the revised provisions of the Louisiana Civil Code, which became effective only on January 1, 1985, and which are not retroactive.[3]

First Federal asserts that the district court was clearly erroneous in concluding that it was careless in failing to detect Twin City's fraud and, alternatively, if the court was not in error, it misinterpreted Louisiana law in holding that First Federal's negligence bars relief for fraud. While Twin City does not cross appeal, it does not concede that its actions were fraudulent. In addition to urging that the district court's judgment is correct, Twin City contends that First Federal is barred by laches and by actions that constituted a ratification of the agreement.

II.

■ The district court's conclusion that First Federal was negligent may be reversed only if we find it clearly erroneous.[4] The court's finding was, however, amply supported by the record.

The Building Loan Agreement did refer to the option to extend the loan. The district court's conclusion that "[a] careful review of the documents" would have notified First Federal that "the term was or could be greater than one year" was not unjustified.

The district court also noted that Courtney was given access to Twin City's files. While these were voluminous, and it might, as First Federal argues, have been "inefficient" for him to dig through them, the decision that it was negligent for Courtney not to avail himself of the opportunity is adequately supported. So too is the conclusion that Courtney should have been alerted to some irregularity by the fact that, when he inspected the site, only 9 of the planned 29 buildings were under construction. Of course, the status of the project might have been the result of fully explicable and justified causes, but a fact-finder might reasonably conclude that it warranted inquiry. We therefore analyze the ap-

---

**2.** Quoting *Marsh Inv. Corp. v. Langford*, 620 F.Supp. 880, 885 (E.D.La.1985), *aff'd*, 784 F.2d 184 (5th Cir.1986).

**3.** *Marsh Inv. Corp. v. Langford*, 784 F.2d 184, 185 n. 1 (5th Cir.1986).

**4.** Fed.R.Civ.Proc. 52(a).

plication of the principles of Louisiana law to the facts found by the district court.

## III.

■ At the time of the transaction, the controlling principles of Louisiana law were set forth in Louisiana Civil Code Article 1847. This provided:

Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. From which definition are drawn the following rules:

. . . . .

3. A false assertion as to the value of that which is the object of the contract, is not such an artifice as will invalidate the agreement, provided the object is of such a nature and is in such a situation that he, who is induced to contract by means of the assertion, might with ordinary attention have detected the falsehood....
4. But a false assertion of the value or cost, or quality of the object, will constitute such artifice, if the object be one that requires particular skill or habit, or any difficult or inconvenient operation to discover the truth or falsity of the assertion....[5]

The text of Louisiana Civil Code Art. 1954, which became effective after the events described and therefore is not applicable, states categorically the rule that the district court applied:

Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.[6]

The official comment explains the meaning of the former article, 1847, and the change made by Art. 1954:

This Article is new. It changes the law in part. *It generalizes the defense pro-*

*vided in C.C. Art. 1847(4) (1870) for cases involving false assertions of value, cost, or quality.*[7]

This indicates that the redactors of Art. 1954 thought that, before the change, the defense permitted by Art. 1847(4) was confined, as its text states, to "false assertions of value or cost, or quality."

Somewhat inconsistently with this observation, however, the comment then states:

This is consistent with views expressed by the Louisiana jurisprudence. In *Rocchi v. Schwabacher & Hirsch*, 33 La. Ann. 1364, 1368 (1881), the court asserted: "Where the means of knowledge are at hand, and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say, ... that he was deceived by the vendor's misrepresentations." In *Forsman v. Mace*, 111 La. 28, 35 So. 372 (1903), the court said: "After reading and carefully weighing the evidence pro and con the other grounds of nullity, we are not satisfied that the fraud complained of has been made out. Two of the plaintiffs were experienced timbermen. They were taken to the logging camp, and afforded the fullest kind of opportunity to examine and be informed as to the condition of the oxen, and as to the location and quantity of the timber. By so simple a thing as looking at the map of the parish they could have known of the distance. They went over the land to look at the timber, and if they did not go over all of it they have but themselves to blame." 35 So. at 374.[8]

That observation at least implies that the Louisiana jurisprudence, at least in the two cases cited, both decided more than eight decades earlier, had gone beyond the text of Art. 1847, whose language referred only to representations of value, cost, or quality.

In our opinion, the decisions in these cases, however, do not support the interpretation placed on them. The quotations

---

5. La.Civ.Code Ann. art. 1847 (West 1952).

6. La.Civ.Code Ann. art. 1954 (West 1987).

7. *Id.* comment (a) (emphasis added).

8. *Id.*

from the opinions are indeed accurate, but they must be placed in context.

In *Rocchi,* the court found that the defendants, who were accused of fraud, were not guilty of this transgression. The court said, "The evidence utterly fails to show that defendants ever made any representations touhing [sic] the quality of the lard which the agent bought from them, or warranted any lot of such commodity to be of any particular quality or market value." [9] It later added:

> A careful analysis of the testimony abundantly proves that defendants, who were not the manufacturers of the goods thus sold by them, were perfectly and honestly ignorant of the defects of such goods, of which they had no more occasion, or better means of judging than plaintiff or his broker had; that the quality of the lard was as well known to the vendee's agent as to the vendors, that the latter made no misrepresentations, and practiced no concealments, fraudulent or otherwise, touching the commodity which they were thus selling. And hence, we conclude that they are not responsible in law for the damages which plaintiff has suffered in this unfortunate speculation, brought about by the error of his own agent, who was not deceived by defendants, but was led astray by his own judgment.[10]

In *Forsman,* as the quoted statement notes, the court found that fraud had not been "made out," and it did not find a fraudulent statement to which a defense under Art. 1847(4) could be asserted. It added, immediately after what is quoted in the comment to Art. 1954:

> We think the case is fully covered by *paragraph 3* of article 1847, Civ.Code, reading as follows: "A false assertion as to the value of that which is the object of the contract, is not such an artifice as will invalidate the agreement, provided

the object is of such a nature and is in such a situation that he, who is induced to contract by means of the assertion, might with ordinary attention have detected the falsehood; he shall then be supposed to have been influenced more by his own judgment than the assertion of the other.[11]

Patently, the court's decision was based not on paragraph 4 but on paragraph 3.

These two cases, moreover, represent but a fragment of the Louisiana jurisprudence for Article 1847(4) had been applied in a host of other cases before the codal revision. When first examined, the pre-1985 Louisiana cases appear to be inexplicably in conflict concerning whether the defense is confined to misrepresentations enumerated in art. 1874(4) (value, cost, or quality) or to misrepresentations in general. One fruitful method of analysis, however, as First Federal's counsel suggests, is to examine the cases in which the litigation is between the perpetrator of a fraud and his negligent victim, who seeks to rescind the contract entered into as a result of the fraudulent misrepresentation, and those between a victim of fraud and an innocent third party, who asserts that the victim of the fraud was negligent, a situation that involves in essence determining which of two innocent parties is to bear the loss occasioned by a third party's fraud.

Let us first examine the application of Art. 1847 in suits between victim and perpetrator. The opinion of the Louisiana Supreme Court in *American Guaranty Company v. Sunset Realty & Planting Company* [12] supports the restrictive and literal application of Art. 1847(4). In that case one Small, as the agent or joint adventurer of Sunset Realty & Planting Company obtained a quit-claim deed from American Guaranty by fraud. In American Guaranty's suit to set aside the quit-claim, the court found, "it was apparent that the

---

9. 33 La.Ann. 1364, 1367 (1881).

10. *Id.* at 1368.

11. 35 So. at 374 (emphasis added); *see also La Croix v. Recknagel,* 230 La. 842, 89 So.2d 363 (1956).

12. 23 So.2d 426 (La.1945) (on rehearing).

representatives of the American were relying on [Small's] statements [concerning the value of and title to the property] and had not made and could not, *without great difficulty and expense, make an investigation to determine the value of the land.*"[13] Even though the misrepresentation was of value, therefore, the court set the transaction aside. In part of its lengthy opinion, however, the court observed:

> In the event the speaker is guilty of material misrepresentation or concealment, the contract or deed is vitiated by his fraud, because he deceitfully obtained the consent of the other party to the transaction. An invitation by the offender to inspect or to investigate will not excuse him from his misconduct as it is not a defense of his wrongdoing to stand before the court and plead that the defrauded party unwisely or carelessly trusted him and placed too much confidence in his honesty and truthfulness.[14]

In *Overby v. Beach*[15] the Louisiana Supreme Court likewise interpreted Art. 1847 restrictively in a suit by the buyer of an apartment house against the seller to rescind the sale for error or fraud, although apparently the claim was made under the different terms of paragraph 3. After first affirming the dismissal of the action, the court granted a rehearing and held that the buyer had stated a cause of action, declaring:

> A reconsideration of the matter has convinced us that our former view was erroneous and that paragraph 3 of Article 1847 of the Civil Code, which was cited as authority supporting the conclusion, is without application to the factual allegations presented by the petition....
> In the case at bar, the misrepresentation was not as to the value of the object of the contract but rather a misstatement concerning a quality of the object. It was not an assertion as to how much the apartment house was worth or how much

rent it should or would produce; it was the misrepresentation of a fact respecting the legal amount of rent the apartments were actually bringing at the time the apartment was confected. And, according to plaintiff's allegations, it was because of this representation that she was induced to purchase the property. These averments, which must be accepted as true for the purpose of considering the exception, amply state a cause for rescission attributable to error of fact under Articles 1821, 1823, 1826, 1845 and 2529 of the Civil Code.

> \*     \*     \*     \*     \*     \*

> ... the petition discloses a case of nullity resulting from fraud under Article 1847 of the Civil Code, as the false assertion forming the ground of complaint was not one as to the value of the object of the contract which is given special consideration under paragraph 3 of the Article.[16]

Similarly, in yet another suit between perpetrator and victim, the Louisiana Court of Appeal observed in *Beal v. Lomas and Nettleton Company:* "Lomas argues further that the Beals breached their own duty to read the American policy which was attached to this letter. However, once the Beals were misled into believing that the coverage was the same, they were under no duty to read the attachment."[17]

On the other hand, in *Scott v. Bank of Coushatta*[18] a bank sought to hold a father and mother liable on a note forged by their son. The parents were innocent of complicity as was the bank, but the bank might readily have discovered the forgery by looking at the parents' signature card. The court characterized the bank's claim as one of error, and held that its "lax banking practices" precluded its recovery.[19]

A federal diversity-jurisdiction case, applying Louisiana law, permitted the negligence of the victim of the fraud to bar

13. *Id.* at 459 (emphasis added).

14. *Id.* at 449.

15. 55 So.2d 873 (La.1951).

16. *Id.* at 880.

17. 410 So.2d 318, 321 (La.Ct.App.1982).

18. 512 So.2d 356 (La.1987).

19. *Id.* at 363.

recovery from an innocent party. In *Marsh Investment Corporation v. Langford*,[20] one John Langford had, as part of a fraudulent scheme to defraud a bank, secured the release of debts owed the bank by his mother. His mother was innocent of any involvement in the scheme. The bank, while equally innocent, might readily have discovered Langford's fraud. Indeed, the district court characterized its conduct as "gross fraud or negligence," [21] and refused to set aside that part of the transaction by which Langford's mother had been released "regardless of whether she is an innocent part in the [fraudulent] restructuring transaction or 'the beneficiary of her agent's calculated fraud.' " [22]

On appeal, we affirmed, stating: "It is clear to us that the pre–1985 Louisiana Civil Code contemplated that contracts may be rescinded for fraud, but where the defrauded party might have detected the fraud but for his negligence, he is estopped from claiming recission." [23]

In *Buxton v. McKendrick*,[24] on which Twin City relies, the court considered a suit by the victims of alleged fraud to set aside documents they had executed as a result of that deception. The court did not find that misrepresentations had been made by the party with whom the defendants were dealing, but stated that, even if some had been, they could not have been the direct cause of execution of the documents and could not be imputed to the defendants. The court quoted the opinion of the trial court, in which that court observed:

> However far this opinion [*American Guaranty Co.*] may be interpreted to go, it does not and cannot destroy the jurisprudence of this State that imposes upon every party to a contract the obligation

of putting forth some effort to ascertain the nature of the engagement he is confecting. Certainly, it does not relieve one who undertakes an obligation of all responsibility whatsoever in ascertaining the nature thereof.[25]

This statement is pure obiter dicta. Moreover, *Buxton* did not turn on the failure of the plaintiff to investigate, but on the finding that the alleged defrauded party did not rely on the alleged misrepresentations.[26]

Even in actions based on error, not fraud, Louisiana courts have repeatedly held that the buyer of a business or other property need not examine public records, question third parties, or conduct detailed personal inspections to verify representations of the seller.[27] If investigation to avoid error is not essential, it would seem *a fortiori* that lack of investigation ought not be a defense to fraud.

To permit the perpetrator of a fraud to escape liability because of the failure of his victim to take precautions to prevent deception imposes on an innocent party a duty of care to avoid the culpable conduct of a miscreant. Article 1847(4) carefully limits this exoneration to the kind of representation that is frequently characterized as mere puff or opinion, readily susceptible of verification, as is indeed shown by the limitation of the defense to those instances in which the truth might conveniently have been discovered. To generalize such a rule not only counterbalances the usual moral scale on which innocence and guilt are weighed but is contrary to the general rule of American law. Thus the Restatement (Second) of Torts states: "The recipient of a fraudulent representation of fact is justi-

**20.** 721 F.2d 1011 (5th Cir.1983), *on remand*, 620 F.Supp. 880 (E.D.La.1985), 784 F.2d 184, 185 (5th Cir.1986).

**21.** 620 F.Supp. at 885.

**22.** *Id.* at 886.

**23.** 784 F.2d at 185 (citing *La Croix v. Recknagel*, 230 La. 842, 89 So.2d 363, 366–67 (1956)).

**24.** 223 La. 62, 64 So.2d 844 (1953).

**25.** 64 So.2d at 849.

**26.** *Id.; see also LaCroix v. Recknagel*, 230 La. 842, 89 So.2d 363, 366 (1956).

**27.** *See Carpenter v. Skinner*, 224 La. 848, 71 So.2d 133, 136 (1954); *see also Guaranty Sav. Assurance Co. v. Uddo*, 386 So.2d 670, 674 (La. Ct.App.1980), *cert. denied*, 389 So.2d 1126 (La. 1980); *Nugent v. Stanley*, 336 So.2d 1058, 1063 (La.Ct.App.1976); *C.H. Boehmer Sales Agency v. Russo*, 99 So.2d 475, 476–77 (La.Ct.App.1958).

fied in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation." [28] Indeed, the Comment to this section observes:

The rule stated in this Section applies not only when an investigation would involve an expenditure of effort and money out of proportion to the magnitude of the transaction, but also when it could be made without any considerable trouble or expense. Thus it is no defense to one who has made a fraudulent statement about his financial position that his offer to submit his books to examination is rejected.[29]

Prosser and Keeton state in their standard work on Torts:

The last half-century has seen a marked change in the attitude of the courts toward the question of justifiable reliance. Earlier decisions, under the influence of the prevalent doctrine of "caveat emptor," laid great stress upon the plaintiff's "duty" to protect himself and distrust his antagonist, and held that he was not entitled to rely even upon positive assertions of fact made by one with whom he was dealing at arm's length. It was assumed that any one may be expected to overreach another in a bargain if he can, and that only a fool will expect common honesty. Therefore the plaintiff must make a reasonable investigation, and form his own judgment. The recognition of a new standard of business ethics, demanding that statements of fact be at least honestly and carefully made, and in many cases that they be warranted to be true, has led to an almost complete shift in this point of view.

It is now held that assertions of fact as to the quantity or quality of land or goods sold, the financial status of corporations, and similar matters inducing commercial transactions, may justifiably be relied on without investigation, not only where such investigation would be burdensome or difficult, as where land

which is sold lies at a distance, but likewise where the falsity of the representation might be discovered with little effort by means easily at hand. The plaintiff is not required, for example, to examine public records to ascertain the true state of the title claimed by the defendant. It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.[30]

Louisiana is, of course, a civilian jurisdiction, and the common-law course is not controlling. But civilian authority supports the same view.

In 1980, Jacques Ghestin summarized French law as follows:

Mais il faut aller plus loin et considérer que, de même qu'en matière d'erreur simple, *la mauvaise foi de l'une des parties rend toujours l'erreur de l'autre excusable* (70). Le mensonge, par la gravité de son caractère intentionnel, interdit de tenir compte de l'imprudence ou de la naïveté de l'autre contractant. La jurisprudence la plus récente consacre cette solution. Elle l'a admis lorsque le menteur était un professionnel (71); mais aussi lorsqu'il s'agissait d'un simple particulier (72) ou que la victime était elle-même un professionnel (73). Dans un arrêt due 23 mai, 1977 (74) elle a expressément considéré que la constatation due dol "qui avait provoqué l'erreur ... avait par là même justifié le caractére excusable ... reconnu à cette erreur". La solution est d'autant plus nette que le dol n'était déduit que du "silence due mandataire des vendeurs". Ainsi l'erreur est toujours excusable lorsqu'elle a été provoquée par un dol de l'autre partie. Les droits des divers États du Marché commun, à l'exception de la Bel-

**28.** Restatement (Second) of Torts § 540 (1976).

**29.** *Id.* comment a.

**30.** W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 108, at 751–52; (5th ed. 1984) (footnotes omitted).

gique et du Luxembourg, sont d'ailleurs en ce sens (75).[31]

This has been translated by Dr. Vernon V. Palmer, Professor of Law at Tulane University Law School, as follows:

> But it is necessary to go further and to consider that, just as in the case of a simple error, *the bad faith of one of the parties always renders the error of the other party excusable.* (70) The lie, because of the seriousness of its intentional aspect, forecloses taking into account the imprudence or the naivete of the other contracting party. The most recent cases lay down this rule. They admit it when the liar was a professional (71); but also when a private individual was concerned (72) or when the victim himself was a professional (73). In a case dated May 23, 1977 (74) it was considered that a fraudulent affirmation "which had provoked the error ... had by itself justified the error as an excusable one." This solution is all the more clear because the fraud involved was only deduced from "the silence of the vendors' agent." Thus the error is always excused when it has been provoked or caused by the fraud of the other party. The laws in various countries of the Common Market, with the exception of Belgium and Luxembourg, are also of the same view.

The 1984 edition of Dalloz' *Encyclopedie* confirms Ghestin's summary: "En revanche la simple imprudence du demandeur parait *a priori* moins grave que la faute intentionnelle de l'autre partie."[32] ("The simple imprudence of the plaintiff would appear *a priori* less grave than the intentional fault of the other party.")

Louisiana has chosen a different course for the future in its codal revision but that does not warrant the reconstruction of its logically sound, morally defensible, and explicit earlier code article.

### IV.

The district court did not need to reach and therefore did not consider the alterna-

tive defenses, laches, and ratification. We remand for its determination of these issues.

For the reasons given, we REVERSE the judgment dismissing this action and REMAND for further proceedings consistent with this opinion.

---

**31.** Ghestin, *Traité de Droit Civil, Les Obligations: Le Contrat* 340–41 (1980) (emphasis in original).

**32.** Dalloz, *Encyclopedie,* Dol § 20 (1984).